ALONZO B. VOORHIES, receiver, &c. and JAMES CALLANAN *vs.* MICHAEL MCGINNIS and SAMUEL WESTCOTT.

Nothing of a personal nature in itself will pass by a deed, unless it be brought within the denomination of a fixture by being in some way, permanently, at least habitually, attached to the land, or some building upon it. It need not be constantly fastened. It need not be so fixed that detaching will disturb the earth, or rend any part of the building.

This doctrine has been sanctioned and sustained by repeated adjudications holding that machinery in cotton and other mills, not attached to the building, and capable of removal without injury to it, are not fixtures, but personal property. *Per* MILLER, J.

Within the principle decided in those cases, planing machines and saw benches, saws, shingle machines, copper pipes for steaming hubs, lathes and the appendages and attachments to the same, placed on the floor of a steam mill and affixed to the building for convenience, the saw benches and shingle machine being secured by cleats to keep them in position; and which can be removed without any difficulty, and without occasioning any injury or damage to the building, and be placed elsewhere with an entire adaptation to other localities, have no particular connection with the inheritance, and are not fixtures, but personal property.

Voorhies *v.* McGinnis.

They will accordingly pass under a chattel mortgage thereof, and will not be covered by a mortgage of the real estate, and the mills in which the property is placed.

A steam engine and boilers were erected in a building put up for the purpose of containing and using the same or other like machinery, as an auxiliary to water, and were placed upon solid brick foundations resting upon the ground excavated for that purpose. The foundations were laid in mortar, and built in a permanent and substantial manner, and the engine and boilers were bolted into such foundations. A stack of brick chimney, one hundred feet high, was also built for the use of such boilers, and was used for the boiler fires. Said boilers were of several tons weight, and the engine, with its iron bed plate, was also of several tons weight. The brick work of the foundation for the boilers was carried up and laid over the body of the boilers. The engine and boilers were, notwithstanding, capable of being removed without injury to the walls of the building, and without injury to the foundations on which they were laid, except that the removal of the boilers necessarily involved the displacement of the bricks covering the top of them.

*Held* that the removal of the boilers and engine did not require any such damage to the realty, or destruction of them, as to cancel, annul and destroy an agreement of the owner by which they were to remain personal property and were liable to be taken away and disposed of as such, by a chattel mortgagee, in the event of the owner's failure to comply with the terms of the chattel mortgage.

*Held, also,* that the fact that the building was erected for the express purpose of enlarging the business of the owner of the realty and the machinery adapted to it, could not be considered as making any material difference, so long as the property could be removed without injury to the freehold.

APPEAL from a judgment entered upon the report of a referee. The action was brought to recover the possession of personal property, consisting of a steam engine, boilers, gearing, shafting, planing machine, saw benches, turning lathe, shingle machine, &c. alleged to have been wrongfully severed from the freehold and removed from certain buildings in the town of Coeymans, called the Kimmey Mills, by the defendants, on the 4th day of December, 1862. The cause was referred to A. S. Johnson, as sole referee. On the trial before the referee it appeared that the defendants took possession of the property by the authority of two chattel mortgages executed by Philip Kimmey, whereby the articles described therein absolutely vested in the defendants respectively. The first was dated April 1, 1861, and was executed

by Kimmey to the defendant Westcott, and covered the planing machine, one steam engine, and one pair of boilers, and fixtures.

The referee, in addition to the above, found the following facts:

At the time of the execution of the said first mortgage, the said boilers and one half in bulk of the parts of said steam engine were in Albany city, in an incomplete state, at the manufacturers, the said boilers being new and in process of construction, and the engine old but in process of repair. Said mortgage was not filed until September 25, 1861, when it was filed in the clerk's office of the town of Coeymans, where said Kimmey then and long before resided. Afterwards, and on the 23d day of October, 1861, the said Phillip Kimmey executed another mortgage, being the second above referred to, to the defendant Michael McGinnis, which embraced the articles specified in the above mortgage, and also all the other articles mentioned in schedule A, annexed to the complaint, which mortgage was filed in the clerk's office of the town of Coeymans, on the 24th day of October, 1861, the said Kimmey then residing in that town. Each of said mortgages was given for moneys actually owed by the mortgagor to the mortgagee, and was subsequently renewed by filing copies thereof at the times and in the manner required by law for that purpose. All the said articles of property mentioned in schedule A were situated, at the time they were so taken possession of by the defendants, in an establishment known as the Kimmey Mills, in the town of Coeymans, in the county of Albany, upon a farm of upwards of two hundred acres of land which belonged to the said Phillip Kimmey until said farm was purchased by the plaintiff James Callanan, as hereinafter mentioned. Said James Callanan, on the 18th day of March, 1862, when all the articles mentioned in schedule A were in the said Kimmey Mills, became the purchaser at two foreclosure sales under real estate mortgages, executed by the said Kimmey, of property which, in the said

mortgages, was described as follows, viz: In the earlier mortgage, which was executed by said Kimmey in 1850, before the boilers and engine, mentioned in said schedule A, were placed upon the premises—the lands being 227 acres and upwards, and described by metes and bounds, which in point of fact include the site of the Kimmey Mills, though said mills are not mentioned, in terms, in the said mortgage. In the second of said mortgages, which was executed July 19, 1861, when all the said property mentioned in said schedule was in the said Kimmey Mills in good working condition, and being actually worked and run as connected machinery, the said lands were described as two hundred and twenty-four acres—the metes and bounds being specified, and including, in fact, the said Kimmey Mills—and the description ends with the following expression, "being the same land now in the possession of the said Kimmey, with the mills and buildings thereon." That upon said purchase, conveyances were duly executed, by the descriptions aforesaid, to the said James Callanan, the said property in the schedule to the complaint mentioned remaining at the time of such conveyance in the said mills, and having been all bought by the said Kimmey in the first instance, and placed in the said mills and used there. Said boilers and the steam engine were erected in a building put up for the purpose of containing and using the same or other like machinery therein, and were placed upon solid brick foundations, resting upon the ground, excavated for the purpose. The said foundations were laid in mortar, and built in a permanent and substantial manner, and the engine and boilers were bolted into such foundations. A stack of brick chimney, 100 feet high, was built as part of the building aforesaid for the use of the boilers or such other boilers as might be placed there, and was used for such boiler fires. Said boilers were of several tons weight, and the engine, with its iron bed plate, was also of several tons weight. The brick work of the foundation for the boilers was carried up and laid over the body of the boilers, but the bricks, which

covered the top of the boilers, were not so laid as to be able to sustain themselves in position without the support of the boilers. The engine and boilers were, notwithstanding, capable of being removed without injury to the walls of the building, and without injury to the foundations on which they were laid, except that the removal of the boilers necessarily involved the displacement of the bricks covering the top of them. The shafting and gearing embraced in the schedule was all fitted to the special use of transmitting power from the engine to the particular machines which were employed in the building, and was in length and adjustment adapted to the building where it was used, and was not of value, except as old material in any other place, unless such other place, in its local arrangements, was nearly the same as the said mills. That it was all constructed with special reference to the place in which it was to be set up, and was there firmly fastened and bolted in the beams and timber of the building, but was, nevertheless, capable of being removed without injury to the walls of the building, by the removal of bolts, screws and similar fastenings. That said boilers, engine, shafting and gearing were erected in as permanent and substantial a manner as is usual, and as is adapted to the nature and objects of their employment, and without any special intent on the part of the said Kimmey, who put them up, as to making them a part of the freehold, and without any intention as to removing them at any future time. The planing machine, fire pump, saw benches, and saws, were worked by hands and other modes of transmitting motion from the engine, through the gearing and shafting above mentioned, and were complete in themselves as machines, as were also the copper pipes for steaming hubs, and were of equal use and value wherever they were wanted, and were affixed to the building only for convenience in using, and were capable of removal without injury to the building or to themselves. The first of the said real estate mortgages was foreclosed in the Supreme Court, by suit, in which said

James Callanan was plaintiff, and said Wescott, among others, was defendant, he having a subsequent real estate mortgage on the premises, and his rights as mortgagee of the real estate were alone brought in question in that suit, in which a decree was made for the plaintiff under which the sale aforesaid was made. After the purchase by the said Callanan, a suit was instituted in the Supreme Court, by him, against the said Kimmey and others, to which neither of the defendants in this suit were parties. In said suit the plaintiff Voorhies was appointed receiver, by an order bearing date October 1, 1862, of said property, mills, buildings, fixtures, machinery and gearing, and said receiver, having duly qualified as such, took formal possession of the premises and property before the taking by the defendants, but the defendants, although they had notice of the receivership, did not know at the time of the taking, that the said Voorhies had taken possession as receiver, and did not find any one on the premises, in possession, at the time of the taking by them. The plaintiff, Callanan, loaned to the said Kimmey, the money for which the first mortgage was given, which was largely applied to the purchase of the property mentioned in the schedule to the complaint, but there was not, at that time or subsequently, any agreement between the said parties whereby the lien of the mortgage, or the extent of the property which it covered, or should cover, was in any way varied, increased or diminished, or whereby the legal effect of the said mortgage, or the legal consequences of the relation of mortgagor or mortgagee, was in any way effected so far as respects the property in question in this suit. All of the said articles of property which were annexed to the freehold or building in the manner hereinbefore stated, were so annexed for the purpose of trade or manufacture, and none of them were so fixed into the wall of any building or house as to be essential to its support.

The referee found, as a matter of law upon the facts aforesaid, that the several articles of property in the schedule A,

were not bound by the lien of the said real estate mortgages as against the claims of the defendants under the said chattel mortgages, and that the same, at the time of the commencement of this suit, were not the property of the plaintiffs or either of them, nor were they or either of them entitled to the possession thereof or of any part thereof, but that the defendants were entitled to the possession thereof under and by virtue of the said chattel mortgages, and that judgment ought to be rendered in favor of the defendant, assessing the value of the property, it having been delivered to the plaintiffs, at $1800, and the damages at $399.62. Exceptions were taken to the report, judgment entered, and an appeal taken, to the general term, by the plaintiffs.

*R. W. Peckham, Jr.* for the appellants.

*C. B. Cochran,* for the respondents.

*By the Court,* MILLER, J. The law in respect to fixtures has been the occasion of much discussion, and repeated adjudications, in this state, and the general principles relating to that subject are well settled. The cases, however, are not a little conflicting, and it is sometimes difficult to discriminate, in considering many of the exceptions to general rules, between personal property and fixtures. In fact the line of demarcation is so close and often so nicely drawn that no precise and fixed rule can be laid down to govern and control all cases ; and each one must be more or less dependent upon the peculiar facts and circumstances by which it is surrounded.

In *Walker* v. *Sherman,* (20 *Wend.* 636,) most of the cases arising under the law of fixtures prior to that decision are collected and examined, and the whole subject discussed with much learning and ability. It was there held that machinery in a woolen factory which had been used, and passed from one owner to another, for eleven years or more,

Voorhies *v.* McGinnis.

the same as if actually annexed, was not a part of the realty. The learned judge, who wrote the elaborate and comprehensive opinion in that case, lays down as the general rule from the cases, that nothing of a personal nature in itself will pass by a deed "unless it be brought within the denomination of a fixture by being in some way, permanently, at least habitually, attached to the land or some building upon it. It need not be constantly fastened. It need not be so fixed that detaching will disturb the earth or rend any part of the building." I am not aware that the rule here laid down has been essentially altered by any subsequent decision. In fact it seems to have been sanctioned and sustained by repeated adjudications holding that machinery in cotton, and other mills, not attached to the building, and capable of removal without injury to it, were not fixtures, but personal property. (*Vanderpoel* v. *Van Allen,* 10 *Barb.* 157. *Godard* v. *Gould,* 14 *id.* 662. *Laflin* v. *Griffiths,* 35 *id.* 58. *Murdock* v. *Gifford,* 18 *N. Y. Rep.* 28. *Ford* v. *Cobb,* 20 *id.* 344. *Swift* v. *Thompson,* 9 *Conn. Rep.* 63. *Gale* v. *Ward,* 14 *Mass. Rep.* 352.)

Within the principle decided in the cases cited it is entirely clear that the planing machines and saw benches, saws, single machine, the copper pipes for steaming hubs, lathes, appendages and attachments to the same were personal property, covered by the chattel mortgages, and did not pass under the foreclosure sale. These machines, and other articles were placed on the floor and affixed to the building for convenience, the saw benches and single machines being secured by cleats, doubtless to keep them in position. They could be removed without any difficulty and without occasioning any injury or damage to the building. They could have been placed elsewhere with an entire adaptation to other localities, and had no particular connection with the inheritance. They do not differ very materially in their character, or the general purposes and objects for which they were used and applied, from the machinery and articles which were held to be per-

sonal property in the cases before cited; and I think possessed quite as much the characteristics and elements of personal property, not attached to the freehold, as those articles did. If machinery in a cotton and a woolen, fulling or in a paper mill, which is fastened to the building slightly, for the purpose of being employed in the business there conducted, and in some instances made expressly to suit the building itself, is not to be considered as fixtures, then certainly the property covered by the chattel mortgages which was moveable and similarly situated can safely be regarded as not embraced in that class of property. As to the steam engine and boilers, the question assumes somewhat of a different aspect. There are some views which might be taken, in reference to their situation and connection with the building and real estate, by which they might be considered as not being sufficiently attached to the freehold, as being placed there for the purpose of manufacture and trade; as being capable of removal without injury to the building, and as not being necessary for its support. From these considerations it might be urged, with some force, that they were personal property. No case in this state has ever held that an engine and boilers thus situated could be considered as fixtures. In *Fryatt* v. *The Sullivan Co.*, (5 *Hill*, 116,) where a steam engine and boiler which were leased were held to be converted into real estate, they were affixed so firmly to the freehold that they could not be removed without destroying the building in which they were placed. This is the extent to which the authorities have gone, here. The cases in other states which appear to hold the other way, were cases where it generally appears that the engines were the sole and only motive power used for the purposes of the establishments, and by which they were operated and conducted.

Passing over this aspect of the case, I will assume that the engine and boilers were placed upon and became parcel of the real estate, and consider the effect of the arrangement

between the owner of the land and the mortgagees in the chattel mortgages, by which it was agreed, that although they were connected with and annexed to the freehold as it was contemplated that they should be before the first chattel mortgage was executed and before they were actually placed upon the premises, that they should continue to remain as personal property, to such an extent as would be necesssary and essential to give effect and validity to the personal mortgages. Although real estate can not be changed into personal property by the agreement of parties, yet "it is otherwise with things which, being originally personal in their nature, are attached to the realty in such a manner that they may be detached without being destroyed or materially injured, and without destruction of, or material injury to the things real with which they are connected, though their connection with the land or other real estate, is such that in the absence of any agreement or any special relation between the parties in interest, they would be a part of the real estate." (*Ford* v. *Cobb*, 20 *N. Y. Rep.* 344.) In the case last cited, salt kettles were bought, and mortgaged to the seller as personalty. They were imbedded in brick arches, but could be removed without injury to them by displacing a portion of the brick, at an inconsiderable expense, and the owner of the manufacture required them to be removed and to be re-set annually. It was held that they continued personalty, as against a subsequent purchaser who had no notice of the facts, other than constructively from the filing of the chattel mortgage. The case involved the question whether the method in which the salt kettles were affixed to the freehold was such that they could still be claimed as chattels, or whether they were to be considered as real property. After discussing this question, the learned judge says : "The kettles were originally personal property. The agreement contained in the chattel mortgage preserved their character as personalty, which would otherwise have been lost by their annexation. They therefore continued to be personal chattels, notwith-

standing the annexation, and the plaintiff, by filing the mortgage, observed all the formalities required by law to preserve their lien upon that kind of property. The title to the kettles did not therefore pass by the conveyance to the plaintiff." The case cited, in many of its leading features, bears a striking similarity to the case at bar, and I think both involve precisely the same question. In neither case was the property removed considered necessary for the support of the building; nor was its condition materially changed or its value essentially diminished, by their removal. In both cases, it was necessary to remove the brick. Although the brick work was laid over the boilers, yet they could be removed without any injury to the foundation, upon which they were laid, except the displacement of the top covering. The shafting and gearing, although constructed with especial regard to the place in which it was used, and firmly fastened and bolted in the beams and timber of the building, was also capable of removal without injury to the building. It is not claimed that these were of any importance in supporting the building, or that they were materially changed in value by being employed elsewhere. They could be used in another location. The manner in which these articles were annexed to the building was not any more substantial than that of the salt kettles, which could only be used for that particular kind of business. The fact that the salt kettles had to be taken out and re-set as often as once a year, in the ordinary course of the business of manufacturing salt, does not vary that case essentially from this; as repairs might be needed for the boilers and engines, which might require similar work upon them, and as the business in which they might be made useful would be more varied and extensive than the salt kettles, which were of no sort of consequence in any other business.

I do not think that the removal of the boilers and engine required any such damage to the realty, or destruction of them, as to cancel, annul and destroy an agreement by which they

were to remain personal property, and were liable to be taken away and disposed of as such in the event of a failure to comply with the terms of the chattel mortgages.

Nor do I consider the fact that the building was erected for the express purpose of enlarging the business of the owner of the realty and the machinery adapted to it, as making any material difference, so long as the property could be removed without injury to the freehold. In *Godard* v. *Guild*, (14 *Barb.* 662,) where the machinery was manufactured for and set up in a paper mill, and the mode of annexation was such that it could be removed without injury to the building, it was held, that it did not by the annexation become part of the realty. Such was also the case in *Ford* v. *Cobb*, where the salt kettles were especially adapted to the works, and were purchased expressly for them.

It may also be observed that the steam engine did not entirely furnish the motive power used in the establishment. Prior to 1850 the sole power applied for carrying on the saw and grist mills and the machinery connected therewith, was the water power. Since then, it continued to be the principal power. The steam engine was only an addition to the hydraulic power, for the purpose of increasing the facilities for business. It was an independent power employed to run separate machinery which had been placed in the building as an addition to what was previously there. It was not therefore a component part of the structure, without which it would be imperfect and incomplete, (14 *Barb.* 164,)

The views which I have expressed lead me to the conclusion that neither the steam engine and boilers, nor any of the other articles covered by the chattel mortgages, were so connected with and annexed to the freehold that their identity became destroyed as personal chattels, and therefore there is is no legal ground for refusing to enforce the arrangement incorporated in the mortgages, by which they were regarded and designated as personal property, and were to retain that distinctive character.

I have examined the other points taken by the plaintiff's counsel, and do not think that they are available. They are mainly covered by the observations already made.

My opinion is that the personal chattels described in the pleadings were not attached to the realty in such a way as to bring them within the denomination of fixtures, and therefore the judgment entered upon the report of the referee must be affirmed.

[ALBANY GENERAL TERM, December 4, 1865. *Hogeboom, Peckham* and *Miller,* Justices.]