(26 App. Div. 420.)

### NASON ICE–MACH. CO. v. UPHAM et al.

(Supreme Court, Appellate Division, Second Department.   March 8, 1898.)

MECHANIC'S LIEN—WHEN ALLOWED.

In an action brought under Laws 1885, c. 342, as amended by Laws 1895, c. 673, to foreclose a mechanic's lien for furnishing and placing upon the premises owned by one of the defendants, and leased by another, an ice-making machine, under a contract with a former tenant, there was evidence that the machine was masoned into the ground, and was so constructed that the building to which it was fastened would have to be taken to pieces in order to remove the tanks, and the trial judge found that the work and material "were used in the erection and alteration of the buildings on the premises." *Held*, that if the work was done and material furnished with the owner's consent, a lien would exist under the statute.

Appeal from special term, Westchester county.

Nason Ice-Machine Company against Sarah B. Upham and the Yonkers Hygeia Ice Company.   From part of a judgment dismissing the complaint on the merits against two of the defendants, with costs, plaintiff appeals.   Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, and HATCH, JJ.

Charles De Hart Brower, for appellant.
Joseph F. Daly, for respondents.

WILLARD BARTLETT, J.   This is an action to foreclose a mechanic's lien claimed by the plaintiff for furnishing and placing upon the premises of the defendant Upham, in the city of Yonkers, a certain ice-making apparatus of a specified patent.   The contract for installing the apparatus was made with the defendant Heermance, who, at the time, was the lessee of the premises. Before the machinery was completely installed, the defendant Heermance assigned his lease to the Yonkers Hygeia Ice Company.   The trial court rendered judgment in favor of the plaintiff against the defendant Heermance personally for the value of the ice-making apparatus, but held that the notice of lien was insufficient, and dismissed the complaint on the merits as against the defendants Upham and the Yonkers Hygeia Ice Company.   The record indicates that the lien was deemed insufficient upon the ground that the statute did not authorize a mechanic's lien for ice-making machines.   The mechanic's lien law in force at the time the action was commenced and at the time of the trial was chapter 342 of the Laws of 1885, as amended by chapter 673 of the Laws of 1895.   Under the first section of that statute a lien might be acquired by one who performed any labor or service or furnished any materials used or to be used in erecting, altering, or repairing any house, wharf, pier, bulkhead, bridge, vault, building, or appurtenances to any house, building, or building lot, or who should dredge, fill in, grade, or otherwise alter or improve land under water, meadow, marsh, swamp or other low lands, or who should perform any labor or services or furnish any materials used in improving or equipping any house, building, or appurtenances with any chandeliers, brackets, or other fixtures or apparatus for supplying gas or electric light, with the consent of the owner.   Un-

der ordinary circumstances, the language used in this section would not embrace the furnishing of an ice-making apparatus; and, if nothing appeared in the case beyond the fact that such an ice-making apparatus as is described in the contract between the plaintiff and the defendant Heermance was placed upon the land of the defendant Upham, I should think the ruling of the trial court was clearly correct. But something more does appear. The learned trial judge expressly finds, in his formal decision, after reciting the making of the contract for the erection of an ice-making plant upon the premises described in the complaint, that the plaintiff duly performed such contract, and that the work and materials required by said contract "were used in the erection and construction of said plant upon the aforesaid premises, and in the erection and alteration of the buildings upon said premises." Here, then, we have it distinctly decided, as matter of fact, that the labor performed and the materials furnished pursuant to the contract for putting up the ice plant were actually used in erecting and altering buildings upon the land. This finding brings the work and materials directly within the scope and purview of the statute, and, if there was any evidence to sustain such finding, it followed that the plaintiff was entitled to a lien. I think there is enough evidence in the record to support the finding. One witness testified that the machine was masoned into the ground, and was so fastened to the building that the building would have to be taken to pieces in order to remove the tanks. This testimony, though meager, warranted a conclusion like that which was reached in regard to a similar annexation to the freehold in Watts-Campbell Co. v. Yuengling, 125 N. Y. 1, 25 N. E. 1060,—that the plaintiff performed labor and furnished materials in altering or repairing a building for which a lien could be acquired under the statute. The learned trial judge did not pass upon the question whether the work was done and the materials were furnished with the consent of the owner, evidently because he deemed this question immaterial in view of his decision that there could be no lien for an ice plant. The proof on this subject was conflicting, and it is not necessary that we should express any opinion in regard to its weight, as more testimony upon this branch of the case may be offered on a new trial. It is enough, for the purposes of the present appeal, to say that the evidence on the first trial would have warranted, though it did not require, a finding that such consent was given.

These views require a reversal of the judgment so far as appealed from.

CULLEN and HATCH, JJ., concur.

GOODRICH, P. J. (concurring). The action is for the foreclosure of a mechanic's lien. The defendant Sarah B. Upham was the owner of certain premises on Woodworth avenue, in the city of Yonkers, on which there was a three-story building. She leased the premises to the defendant Heermance by a written lease for one year from May 1, 1894. This lease gave to Heermance the option, during the term of the lease, to purchase the premises for $8,500, and he covenanted not to "assign this lease, nor let or underlet the whole or any part of the said premises,

save only to any ice-manufacturing company or corporation to whom he shall choose to assign or underlet." Heermance went into possession of the premises, and made a contract with the plaintiff for the construction of ice-making apparatus, and, upon the completion of the work under the contract, the plaintiff, on October 4, 1894, filed a mechanic's lien against the property for the contract price and extra work, amounting to about $19,000, less certain payments made thereon. The answer of the ice company alleges that on June 18th Heermance entered into a written contract with it, in which it was recited that he had partly erected and then owned "a certain plant, buildings, fixtures, and appurtenances," and that the company had agreed to purchase "said plant and its appurtenances (excepting, however, the certain three-story building erected on said premises) as the same is now partially completed," and thereupon it was agreed that Heermance, in consideration of $65,000 stock of the company and $25,000 in cash, should complete the said ice-manufacturing plant and its appurtenances which were sold and delivered to the company by a bill of sale of even date with the agreement. The contract under which the work was done consists of a letter addressed to W. L. Heermance, and signed, "Nason Ice-Machine Co.," in which the latter proposed "to furnish, and erect, deliver, start, and turn over in running order" a specified ice-making apparatus "on your premises at Yonkers," guarantied to have a capacity of 25 tons of ice per day. The plaintiff was to furnish the apparatus, consisting of two machines, each with a steam engine, a full set of anchor plates and foundation bolts for each machine, four ice tanks, condensers, cranes, tackle, and small tools, all the above being elaborately specified; also two foundations, for which Heermance was to furnish the excavating. The buildings, some carpenter work, and some of the connections, not included in the estimate, were to be, and were, erected and furnished by Heermance. The court found, among other things, that "the plaintiff duly performed the contract on its part, and, in addition, at the request of the defendant Heermance, performed certain extra work and furnished certain extra material, all of which work and material and the work and materials required by said contract, were used in the erection and construction of said plant upon the aforesaid premises, and in the erection and alteration of the buildings upon said premises"; and directed a judgment in favor of the plaintiff against the defendant Heermance for the amount found due, but dismissed the complaint as against the defendants Sarah B. Upham and the Yonkers Hygeia Ice Company, and directed a cancellation of the lien. From that part of the judgment entered upon this decision, which dismisses the complaint as against the defendants Upham and the company, and directs a cancellation of the lien, the plaintiff appeals.

It becomes necessary to consider certain rulings which do not appear in the decision as signed by the justice. When the mechanic's lien filed in the office of the city clerk was offered in evidence by the plaintiff, objection was made upon the ground that the statute does not authorize a mechanic's lien for ice-making machines, and that there is nothing in the lien which shows any contract between the defendant Upham and the defendant Heermance. The objection was sustained,

and the lien was excluded under the plaintiff's exception. This brings us to the consideration of the question whether the statute authorizes a lien for ice-making machines. The statute (3 Rev. St. [9th Ed.] p. 2635) creates a lien in favor of any person furnishing labor or materials used in erecting, altering, or repairing any house, building, or appurtenances of any house, with the consent of the owner, whether owner in fee or of less estate, or whether a lessee for a term of years, upon such house, building, or appurtenances, and upon the lot upon which the same stand. It will be observed that several things are essential to the creation of a lien. First, the work or materials must be used in the erecting, altering, or repairing of the building or appurtenances; second, they must be furnished with the consent of the owner, as above defined; third, such owner must be the owner of the fee, or of a less estate, or a lessee for a term of years. The underlying principle of the statute by which a lien is authorized is the fact that the service and property of the lienor have, with the consent of the owner, entered into and become a component part of the owner's property, and that justice requires that compensation be made therefor out of the property benefited. It is absolutely essential that the work should have been done with the consent of the owner, whereupon his consent operates as an estoppel upon the owner to deny the benefit conferred upon his property.

In the case of the Watts-Campbell Co. v. Yuengling, 125 N. Y. 1, 25 N. E. 1060, the court held that the plaintiff was entitled to a lien for the erection of a gas compressor, engine, two oiltraps and foundation plates, on certain premises owned by the defendant. In that case the contract was made directly with the owner of the premises, so that his consent was not in question; but the court held that the labor performed and materials furnished were for the purpose of making a permanent accession to the realty, saying:

"The articles furnished by the plaintiff were, in fact and in intention, annexed to the freehold, so as to become a part of it, and would, as between vendor and vendee, pass by deed of the premises without special enumeration. Hence the plaintiff performed labor and furnished materials used in altering or repairing a building, or appurtenances thereto, for which he could have acquired a lien under the statute."

I can see no essential difference between the character of the work done by the plaintiff in the case just cited and the character of the work done by the plaintiff in this case, as impressing upon the result of the labor and materials the character of fixtures. The testimony upon that subject reads:

"I am a mechanical engineer, and was employed by the plaintiff in putting up the ice plant for Col. Heermance at Yonkers. The compressor engines had anchor plates about a foot under the ground. There were built brick foundations for them. A bolt comes up through the foundation, and through the anchor plates. The bolts cannot be removed without taking down the brick foundation. The brick foundation comes about twenty-six inches above the ground, is two feet wide by from fifteen to eighteen feet long. There are two of these foundations. The engines are fastened to the brickwork by nuts on the bolts. There are ten bolts to each foundation. It is necessary that the engines should have these foundations. The foundations were built first, and the building was built around it. The building in which the ice tanks · are adjoins the building in which the engines are; that is, they are different· rooms.

The tanks are about twenty feet in length and between four and five feet deep. The building was not completed when the tanks were put in; a foundation was first made for the tanks. The tanks were put in in sections. The building was enlarged to get the tanks in. The space between the walls and the tanks was left for insulation. The beams ran across from side to side across the top of the tanks. The Court: Q. How was this machine attached to the building? A. It was masoned into the ground. Mr. Haines: The ice-tank arrangement was fastened to the building and the building would have to be taken to pieces to take the tanks out. You would have to remove everything to get it out. The floor timbers formed a part of the apparatus."

The first question to be considered is as to the character thus impressed on the articles which were furnished and set up by the plaintiff in the building already on the land, or which were erected by Heermance or the ice company. In the agreement between the plaintiff and Heermance it was provided that the plaintiff was to furnish and put in the foundations for the engine and compressor; that Heermance was to do the excavation, and to furnish solid ground for them to stand upon, and was also to erect the buildings, tank insulation, carpenter work around the brine tank, and all necessary water and steam connections for the plant. The evidence shows a very pronounced attachment of the machinery to the soil and the foundations; that a building was subsequently erected around it; that a foundation was first made for the tanks; that the building was enlarged to get them in, and subsequently more buildings erected around them; beams run from side to side of the building across the top of the tanks; that the machine was masoned into the ground; that the ice tank was so fastened into the building that the latter would have to be taken to pieces in order to take it out; and that a tall chimney was erected.

In the case of Potter v. Cromwell, 40 N. Y. 287, a judgment creditor of the owner of certain premises had issued execution, and the sheriff had sold the premises to the defendant Cromwell. The owner had previously erected upon the premises certain machinery, including what is known as "Noyes' Portable Grist Mill." After the sheriff had made the sale, the judgment debtor surrendered possession to the defendant, who, with the consent and permission of the judgment debtor, removed the machinery and grist mill, and subsequently received the sheriff's deed of the premises. The plaintiff was subsequently appointed receiver in supplementary proceedings against the debtor, and brought his action to recover the property which had been removed from the mill. The court of appeals held that the mill was a part of the realty, the title to which passed by the sheriff's deed. There was considerable review of the authorities upon the subject of fixtures, the court recognizing the distinction between property affixed to the building so that it could be easily detached and machinery erected in such a way that it could not be removed "without injury to the building, or any portion of it." The court adopted and approved the doctrine as to fixtures laid down in Teaff v. Hewitt, 1 Ohio St. 511:

"That the true criterion of a fixture is the united application of three requisites: First, actual annexation to the realty, or something appurtenant thereto; second, application to the use or purpose to which that part of the realty with which it is connected is appropriated; third, the intention of the party making the annexation, to make a permanent accession to the freehold;" and held: "Under all the authorities, therefore, in this state as well as elsewhere, this mill was a fixture; fcr it was annexed to the building erected upon the land, to be

applied and appropriated to the business there to be carried on, with the design that it should be a permanent structure for use as a custom grist mill for the neighborhood existing about it."

This definition was again approved by the court of appeals in the case of McRea v. Bank, 66 N. Y. 489, where the owner had erected machinery for a twine factory, and subsequently sold the premises by conveyance describing the land only, taking back a mortgage containing the same description, and, at the request of the grantee, and after the execution of the deed, executed also a bill of sale of the machinery. Great stress was laid upon the fact that, although most of the machines were complete in themselves, and could be removed without material injury to themselves or the building, still there was sufficient evidence to show that the original intent of annexation was to make the machinery permanently a part of the freehold.

Following these three elements of the doctrine of fixtures, I think it appears by the evidence in the case at bar that there was an actual annexation of the plaintiff's erections to the realty, or something appurtenant thereto; second, an application to the use or purpose to which the realty was appropriated; third, that the intention of the parties making the annexation was to make a permanent annexation to the freehold. In regard to the last proposition,—as to intention, —I do not, in this connection, discuss the intention of Mrs. Upham as the owner, for her consent to the erection of the machinery by the plaintiff and to the changes of the buildings on the premises and the erection of new buildings is discussed later. The only parties defendant concerned in the annexation were Heermance, while he was in possession, and subsequently the ice company, which took an assignment of the lease in accordance with the consent of Mrs. Upham in the original leases. There can scarcely be doubt that it was the intention of Heermance and the ice company, who made the erections and additions, that they should be permanently attached to the premises for the purpose of being used as structures for the business of the ice company, equivalent to the intention of the parties in Potter v. Cromwell, supra, that those buildings should be used as a permanent structure for the grist mill for the neighborhood, and in McRea v. Bank, supra, that the premises should be used as a twine factory; and this is emphasized by the fact that it was the original intention of Heermance to purchase the land of Mrs. Upham, as the lease contained an option to the effect that he could purchase it for $8,500. So it is true, I think, that under the authorities already cited Mrs. Upham could have successfully maintained an action to prevent the removal of the machinery which had become a part of the realty, and appurtenant thereto, inasmuch as it clearly appears that the same could not have been removed "without injury to the building, or any portion of it." Potter v. Cromwell, supra. The erections became fixtures within the principle of the Watts-Campbell Case, above cited, and therefore it must be assumed that the statute gave a lien upon the property for the work and materials furnished by the plaintiff, provided the consent of the owner was given to the erection. In examining this latter question, we resort to the two leases by Mrs. Upham to Heermance. The first lease provided that Heermance would not assign his lease,

.nor let or underlet the whole or any part of the premises, except to ice-manufacturing companies; and the second and more formally drawn paper provided that Heermance would not "assign this lease, nor let ·or underlet the whole or any part of said premises, save only to any ice-manufacturing company or corporation to whom he shall choose to .assign or underlet." There is uncontradicted evidence that Mrs. Upham admitted that the property was in the hands of one Richardson, a real-estate broker at Yonkers, for the purpose of renting or selling, and that he told her that he had seen Heermance; "that he had made an offer to rent the property for the purpose of erecting an ice machine or plant," and "that, his offer being satisfactory, she had directed Mr. Richardson to draw up a lease, and accept Col. Heermance's offer"; that the first lease was drawn and signed by both of them, and subsequently the second lease was drawn and executed. She also admitted that she knew about the erection of the plant from what was told her about it by Richardson and by her son, and that she had been .down in the neighborhood of the property, and had seen the buildings going up, especially the chimney, which she could see at a considerable distance. The son afterwards testified that he did not know of any machinery being put in there, and did not go on the premises, but might have seen them from the railroad train, and had told his mother nothing about it. But there is no contradiction of the information given her by Richardson, and her admission that she had seen the buildings and the chimney going up. She was not called as a witness to deny either of those facts, or to show that she did not know of the performance of some work on the premises; and it may be assumed that, if it was possible for her to deny, she would have been called as . a witness.

There have been various decisions of the courts as to what constitutes consent in cases to enforce mechanics' liens. Some of them arose on leases, where the covenant was that the lessee might or should erect buildings which, at the termination of the lease, were to become the property of the lessor, or where express consent to the erection was given in the lease. Mosher v. Lewis, 14 App. Div. 565, 43 N. Y. Supp. 1052; Burkitt v. Harper, 79 N. Y. 273; Otis v. Dodd, 90 N. Y. 336. But there is no such explicit provision in the present lease, other than what has already been stated.

In Havens v. Power Co., 20 N. Y. Supp. 764, at general term, where the lease contained no provision giving the tenant the right to construct buildings, it was said:

"It does not seem to us that it could possibly have been the intention of the legislature to make the owner of land, which he has leased for a long term of years, liable for improvements made upon this land for purposes of trade by his tenant. The mere fact that he may know that the tenant contemplates making certain improvements, or applying the property to certain purposes, certainly cannot make the owner liable for the moneys expended by his tenant in the doing of such work. It seems to us that the clear intent of the statute was to prevent the owner of real estate from permitting improvements to be made upon his property from which he is to derive an ultimate benefit, and which, without his consent or acquiescence, could not be made without incurring some .obligation to those who have supplied labor and materials for the making of such improvements. But in those cases where the owner has no power to prevent the tenant from making such improvements as he sees fit, and from which

the owner can derive no ultimate benefit, it never could have been the intention of the legislature to make such owner liable; and it is doubtful, if they had attempted to do so, whether it lies within their power."

This case is distinguishable from the present by the fact that here the lease gave an implied consent to an assignment to any ice-manufacturing company, and it requires no violent presumption to enable us to decide that the owner knew that the buildings already on the premises were not adapted, without large and important alterations and additions, to the manufacture of ice, and that the lease was taken with that intention, and for that purpose.

In Cowen v. Paddock, 137 N. Y. 188, 193, 33 N. E. 154, the court said:

"While it is doubtless true that the consent required by the lien law need not be expressly given, but may be implied from the conduct and attitude of the owner with respect to the improvements, which are in process of construction upon his premises, still the facts from which the inference of a consent is to be drawn must be such as to indicate at least a willingness on the part of the owner to have the improvements made, or an acquiescence in the means adopted for that purpose, with knowledge of the object for which they are employed."

It has been frequently held that consent implies a degree of superiority, at least the power of preventing, but it may be said here that the lease was made, to the knowledge of the owner, for the purpose of an ice-manufacturing company; that the lease contained an option of purchase; and that she could not have prevented the erection of the plant and buildings in question, as she had given the lessee the right to assign to any ice-manufacturing company. Her consent may, therefore, be implied to the erecting of a plant and buildings such as might generally be supposed to be useful or necessary to the operation of an ice-manufacturing company. The evidence shows that she knew that the work was going on, and did not dissent; that she stood by, and permitted the work to proceed. In his decision the learned justice finds that Heermance, the lessee, made a contract with the plaintiff for the work and materials in question, and that "the work and materials required by said contract were used in the erection and construction of said plant upon the aforesaid premises, and in the erection and alteration of the buildings upon said premises"; and that Heermance, before the completion of the work, "with the consent of the defendant Upham, assigned his said lease to the defendant the Yonkers Hygeia Company, which forthwith entered into possession of said leased premises, and were still in possession at the time of the trial" (December, 1896). There was ample evidence to justify this finding.

In Husted v. Mathes, 77 N. Y. 388,—a case to enforce a mechanic's lien,—the court said that the owner "was informed of the intended improvement, and knew of the work while it was in progress. She received the benefit willingly." In that case there does not appear to have been any written lease, either by the report of the case or the record on appeal.

In Nellis v. Bellinger, 6 Hun, 560, the son of the owner of the fee erected on the premises a house for his own use, and the owner was present on several occasions, and rendered some assistance in the erection of the house. He resided in the neighborhood, and made no ob-

jection to the work being done.    The court held that such facts constituted consent.

We think that the evidence in this action is sufficient to justify the belief that Mrs. Upham consented to the erection of the plant and buildings.    This court had occasion, in the case of Bank v. Shinn, 18 App. Div. 276, 46 N. Y. Supp. 329, to consider the question whether the placing of certain machinery or other appliances by a tenant upon leased premises did not make the property so affixed a part of the freehold, and held that the property remained personalty to such an extent that the tenant had the right to remove it; but in that case the lease contained a covenant that the tenant should have the right to remove within 60 days after the termination of the lease.    This opinion is not in conflict with the principle involved in this action.    The lessee, Heermance, assigned his lease, as he was authorized to do, and sold his interest in the premises to the Hygeia Company, and the company or Heermance completed the plant, and at the time of the trial the company was in possession.    It is perfectly clear that as to certain parts of the work—that is, the chimney and the buildings erected upon the land—neither the lessee nor his assignee nor any tenant would have the right of removal, and there is evidence showing that certain parts of the machinery cannot be removed without a destruction of the buildings.    It may be that the rights of the parties are clearer as to the permanent character of some parts of the erections than they are as to others, but with this difference the plaintiff has nothing to do. It has shown the consent of the owner of the fee to the erections, and the consent of the Hygeia Company may be implied from the fact that the contract of the plaintiff with Heermance was assigned to the company before its completion, that the work was subsequently completed, and that the company is in possession.    As between the plaintiff and either Mrs. Upham or the company, it is equitable that the plaintiff should have his lien upon the whole property; all the more that the estimated value of the land is shown by the lease, which gave Heermance the option of purchase at $8,500, and the value of the work and materials furnished by the plaintiff is nearly two and one-half times as great.    It may be that, as between the owner and the company, there are some equities as to the proportion in which the parties ought to bear the burden of the plaintiff's lien, but we cannot, in this action, consider that question.

The statute gives the material man a lien where the work and materials have been furnished either upon the consent of the owner of the fee, or the owner of a less estate, or of a lessee.    It is silent as to any distribution of the burden of the lien.    The lien covers the land and all fixtures thereon which are so affixed to the freehold as to become a part thereof or appurtenant thereto.    The statute, when defining the lien, uses the words land, building, or appurtenances to the extent of the right, title, and interest of the owner or lessee.    It is evident that the statute was intended to create a lien upon all such different estates as are involved in this action, whether of Mrs. Upham, the owner, or of the company, as lessee or assignee of the lease in possession, upon the land, building, or appurtenances.    The work and materials furnished by the plaintiff come within the category of one

or the other of these words. The plaintiff's work and materials have become a part of the realty, and are in possession of the company, and it is only equitable that the plaintiff should not be deprived of its property without such security as may be derived from the maintenance of its lien. All the requirements of the statute have been complied with, and it was reversible error for the court to exclude the notice of lien filed in the county clerk's office.

The plaintiff is entitled to have and enforce its lien, and it follows that so much of the judgment as directs a dismissal of the complaint as to the defendants Upham and the Hygeia Ice Company and directs a cancellation of the lien must be reversed, and a new trial granted.